Mr. David, we are happy to hear from you, but understand that you are walking into a conversation that is halfway over. We're happy to hear from you. Thank you, Your Honor. May it please the Court, Caleb David on behalf of the State Defendants. The West Virginia Legislature exercised its historic police powers to fill a gap in the 340B statute. It passed a law that prohibits manufacturers from limiting the use of contract pharmacies and from conditioning delivery on providing patient claims data. The District Court in West Virginia got it wrong. It is the only court in the entire country at the District Court level or at the Court of Appeals level that has found one of these delivery statutes to be preempted. It got it wrong when it found that these provisions were an obstacle to 340B, especially in light of the heavy burden that is required to issue a preliminary injunction. This Court should reverse. I want to be clear about the two questions that are before this Court. It was error to find that West Virginia's prohibition on conditioning delivery of 340B drugs on providing claims data was an obstacle to 340B's enforcement. And it was also error to find that the law's enforcement mechanisms intruded on the federal government's role simply because state officials might need to interpret federal law. 340B is a pricing statute. It has three... Can I just ask, do you agree when we sort of look at this that you began by saying a gap in the 340B program? Is the central sort of divide here whether the silence is itself an indicator of preservation of a right to make an offer or whether it is a gap? I mean, is your argument sort of turn on reading the silence with respect to contract pharmacies? I know I'm being imprecise, but bear with me. As a gap that is open to be filled or whether that silence is a preservation of a right for the manufacturer to make an offer. Is that like the distinction such that if it truly... If it spoke to this question through silence or otherwise, you'd agree we'd have a problem. But you think because it's silent and that there's a gap that it's allowed to be filled. Is that trying to get to the nub of it, what you think the right way to think about it is? So I think that two ways to think about this. First, you can think about it as this silence leaves a space open for states to regulate. And that's what Santa Fe said. And I think that's also what Novartis said. Now, if we take the Novartis point and we look at that as whether that's preserving some rights that manufacturers have, we also have to look at the context of the rights that states have. Because absent the 340B program, states have the ability to regulate manufacturers and the shipment of drugs. That's undisputed. It's a health and safety regulation. But that's like a level of generality problem, right? So there's no doubt that you can like regulate pharmacies, right? But the question is, can you regulate the 340B offers, right? So you might be able to regulate whether they can sell cocaine or marijuana for medical purposes. Like that's traditionally within your realm. But it's a little hard to say you have a traditional role in regulating 340B offers. Because it's like a federal program itself. I agree with you. If there's a gap, then you could fill that gap, at least in theory. But if the silence means something, then it seems, in other words, it means preservation, then it seems like you've got a harder road to hoe. Your Honor, the argument that this is a part of the offer, that's the argument that lost in both Santa Fe and Novartis. In those cases, the manufacturers stood before the courts and said that offer and delivery are separate concepts. That was the argument that they made and they won. And now they're standing here and saying, no, delivery is a part of the offer. And then I heard them also say. Yeah, but that seems like maybe I'm not understanding that. Like they're saying, at least the court has said in the D.C. Circuit, that the offer includes something other than price, right? And one of the things it can include is the number of people that it has to treat as the agent of the covered entity. That that's like a preserved right under the spending clause legislation. I don't think that it went that far. And it certainly didn't go far enough to say that that preservation means that in silence we are going to preempt any state law that touches on this. That's simply not a preemption doctrine that exists in any court anywhere. Silence is not a preemptive condition in any statute. And they haven't pointed to a single one that does preempt or Congress has preempted in silence. They don't do that. And particularly, they can't do that in this field because this is the field of pharmacy. This is the field of health and safety. These are traditional areas of state regulation, and Congress has to express a clear manifest purpose to preempt in those spaces. No one argues that Congress expresses that purpose. The argument is that Congress somehow implied it through their silence, but Congress, again, has never done that in silence. They haven't pointed to any specific doctrine where Congress can preempt in silence. Can you point me? Maybe this is another way of asking it. Can you point me to any other example where states have expanded a federal program? Like you've said, this federal program that exists, it needs to be different. We're going to redesign the federal program in West Virginia, and we'll leave the federal program elsewhere. The examples I can think of are all like Medicaid, where the federal statute says that it's cooperative federalism, right? The statutes identify the state's role. What I can't find is an example where states have rewritten federal programs within their borders and imposed additional requirements or obligations on those federal programs just within their borders. Is there an example of that that I ought to look at? As a preface, of course, we disagree that this changes the federal program at all. You do agree that it means for a 340B program, they cannot make the offer they want to make. They can make in other states that don't have your law. I mean, it changes the program in the sense that like in West Virginia, they have to do something different than they do in South Dakota. I don't know if South Dakota has one of these laws, but bear with me, right? We agree with the manufacturers as their position was in the Santa Fe and Novartis case and what those courts held, that these are separate concepts, the delivery and the offer, because the offer is in statute, and the courts in both of those cases specifically said that it's silent, completely silent as to delivery. So it's something that's completely a separate concept. So what they are saying is that we have our own contract pharmacy policies, and there's over 700 manufacturers in the program. So they all have, well, not all of them, but dozens and dozens of them have their own policies that they change without any federal oversight. I guess I don't understand this distinction. They're saying we want to make an offer that says this is an offer to sell you 340B drugs at the price required in full compliance with the 340B program, but that offer is limited to shipping them to a single contract pharmacy. That's the offer they want to make, and you agree West Virginia prohibits them from making that offer. I agree that West Virginia would prohibit them from not shipping to a contract pharmacy. No, no, but West Virginia prohibits them from making the offer, doesn't it? Tell me why you think that's different. Maybe that's where I'm not understanding you. Sure, and why I think that's different is that the federal government was trying to say that this was part of the offer, and therefore they could regulate it. That's what the federal government was trying to do in Santa Fe and Novartis. They issued enforcement letters against the manufacturers and said, you are violating the terms of 340B program by putting these conditions on your offers. And the court said, well, those are different concepts, because that was the winning argument. Okay, but why is that? When your statute says that we prohibit the acquisition under these circumstances, why is that not prohibiting them from making this 340B offer? I guess I don't understand this. All that the statute is saying is that you're going to sell those drugs to a contract pharmacy, and you can't change that. You don't want to say that. I'm sorry. You do not want to say that. I'm sorry, I missed that. You actually are totally right, but that is the opposite of your position. You're going to sell these to a covered entity, and the only thing that's changing is the delivery address. That's literally the only thing that is changing, because you could sell those drugs. No, it's on a totally different set of terms, right? It's not that the delivery is the only thing that's changing, right? It's like whether you get to use 1,000 agents or whether you have to use a single agent, right? It doesn't matter whether the addresses are different or the same, right? The question is just do you get to use a bunch of agents, which make it hard for us to tell about diversion, or do you have to use a single agent? But that's a term of the offer, right? Not merely like a shipping address. The reason it is just a shipping address is because these covered entities can buy all of the quantity of drugs that they want, and they can ship them to contract pharmacies. The problem is that delays the care in actually getting the drugs to the patients. So the covered entities could take on that burden and do this themselves. There's nothing in the statute that prohibits that. At the federal level or at the state level, they could do that. But the purpose was to provide... Maybe, but then they would be responsible for the diversion, right? Because then there would be a debate about are they sending them to the right places and the right people, right? But it may be that a covered entity could do that. The question is, like, is a manufacturer required to let them do it a different way? They're always responsible for the diversion. That never changes. The covered entity is the one that is always responsible for diversion, not a contract pharmacy. So if there is diversion, and you had raised the hypothetical about shipping to other places, and there was a discussion about Johns Hopkins and shipping to all of those different locations, all of that can be resolved in the 340B-ADR program. That's specifically what it's designed to do. And if Johns Hopkins is diverting drugs, particularly in this instance, if they say that, well, they're shipping massive quantities of drugs to Hawaii, that's reasonable cause to initiate the audit process, find out if those are 340B patients. Because that's another thing that I think is getting lost, is that there's nothing that changes who can actually receive these drugs. It will always be a 340B patient. If they are outside of that, the covered entity is engaged in diversion, and the manufacturer can always go to HRSA to correct that. And the covered entity would either have to pay that back or would have to pay that back. The other option is that HRSA can kick them out of the program. So that's something that's handled exclusively in the 340B-ADR process. Can you respond to the argument that your, I think Mr. Perry began with it, and Mr. Owen then brought back to it, that the ADR process includes this very type of claim? I think that that's an interesting position, because that was specifically what was not included in the process in the Santa Fe case and the Vardis case. Because they were putting delivery conditions, they issued enforcement letters, and they said they didn't have that power. And now they're saying that they do have that power. But the regulation was enacted after those, right? After those enforcement letters? And so I thought it was the covered entities that were saying, yes, we want ADR to be able to adjudicate these things. And so when we look at it now, I understand this different argument. But you agree that the current regs permit ADR to address those challenges? I don't believe they do. Why not? That's what I was trying to get at. I don't understand the rest about the other cases where it didn't exist, but why is that? Because Congress still hasn't given that power. They haven't changed the statute and given that power. And that's specifically what Santa Fe and the Vardis found, was that Congress didn't give HRSA the power to regulate. You might lose. That's a different question, right? So, like, the ADR process permits this claim. You're going to lose because we know the federal law doesn't require the offer to extend to any contract pharmacy that you want, right? But, like, the ADR process allows you to bring that claim. I don't think it does. And I think that that's the big difference is that they're talking about overcharging. That's something that's always been within the realm of HRSA and the 340B ADR process because that's something that specifically deals with pricing. Nothing in the West Virginia law deals with pricing at all. It's simply two questions. Did you ship the drugs where the covered entity wanted you to ship them? And did you condition that shipping to whichever location on providing claims data? Those are the only two questions. None of that has to do with pricing. It doesn't have to do with how much is being charged. So that overcharging, they're reading into a definition now, something that they specifically said that HRSA didn't have the power to do two to three years ago in the Sanofi case. So it's a completely different argument that they're making now than what they made then, and they're now saying that, well, we're going to go back and make that same argument again whenever we have to go in front of HRSA. We're going to say, well, you don't have the power to actually deal with this. So they're just jumping after they win these arguments. We're adopting what they won in Sanofi and Novartis and saying that that is the rule here, and they want to change the rules. Let me ask you about the – because you cited the other states and you said the West Virginia. I think this is the only case where the district court has ruled against the states. But you do have that little clause in there regarding the condition, the data claims condition. And, of course, the manufacturers are saying this is in direct conflict with the 340B statute. So I wanted to hear your response to that. Yes, Your Honor. The 340B statute doesn't mention claims data at all. And what the manufacturers are really arguing here is that they should get the opportunity to conduct pre-audit audits, which is not something that's contemplated in the HHS guidance for the audit process or the ADR process. So all they have to show is a reasonable cause to believe that there's been diversion or duplicate discounts. And reasonable cause can be something – Your argument is the same. So in other words, your argument is they're silent about this too. And so the state can prohibit manufacturers from getting information that would allow them to bring an audit. No. You're saying it's not preemptive because there's silence here too. Because the audit provision doesn't quite extend down as far as you suggest. I'm saying what Congress said and what HHS said. Congress doesn't say that they need claims data to initiate an audit. HHS doesn't say that they need claims data to initiate an audit. What they say is that it can be something as simple as the hypothetical that's been discussed. Large quantities of drugs being shipped to locations, big changes in the quantity. It can be patient complaints or complaints from other manufacturers about the activities of a covered entity. So indirect ways are permissible, but direct ways of actually looking at the data West Virginia can prohibit. What West Virginia prohibits is doing it before what the audit process allows. So the audit process allows them to get that claims data. So they can put that in front of HRSA and say we need claims data so that we can confirm that Johns Hopkins is diverting drugs to non-340B patients in Hawaii. West Virginia's law wouldn't stand in the way of that because it specifically says that it prohibits getting that claims data unless HHS requires the claims data. So if they approve an audit plan... Just say one more time. So what in the 340B program prohibits them from getting the claims data? You just said the 340B program prohibits them from getting the claims data pre-audit? What provision prohibits it? It doesn't prohibit it. They're not entitled to it until the audit process. I thought, what was prohibited then? You just said they were prohibited from getting the data. What prohibits them? West Virginia law prohibits them from getting the data before the audit. Nothing entitles them to get it before the audit. And once they have the audit, they can request that claims data in their audit plan. If it's approved by HRSA and HRSA says you're entitled to get this claims data, West Virginia's law doesn't stand in the way. And the problem that they have is they've never once cited to any time that an audit plan has been denied because they didn't have claims data beforehand. They simply do not have that. And I see that my time has expired, so unless there are any further questions, I will reserve the rest for rebuttal. Thank you, Counsel. Thank you. Different order this time. Mr. Perry? Thank you, Your Honor. May it please the Court. I want to address ASTRA enforcement, and I also want to address claims data. But if I might, I'd like to make a specific point, this time about page 53 of West Virginia's brief. And this, again, refers to what I discussed last time I was up, and that's section 4 of Novartis where they said a one-contract pharmacy policy, it's much more limited than universal delivery addressed in Novartis and Sanofi. A one-contract pharmacy policy is fine. Here's what the state says their statute's trying to do. So when a covered, this is a quote, so when a covered entity buys discounted drugs from a drug maker, the act prohibits the drug manufacturer from conditioning that sale on the entity's agreement not to contract with multiple pharmacies. Irreconcilable conflict, Your Honor. Now, if I might also just note, federal preemption, of course, turns on congressional intent, and that's what the Supreme Court was dealing with in ASTRA. What is Congress's intent in the 2010 amendments to 340B? That's section D of the statute and so forth. And as the court already noted in the last argument, Congress intended 340B would be administered and enforced on a uniform national basis without the enforcement burden spread among multiple decision makers, and the risk of conflicting adjudications would be substantial if you had courts or your colleague in the last argument or this one, I don't remember which, says, yeah, but ASTRA is just price, right? That ASTRA is just about price. So it is not that ASTRA would not apply if there was a private cause of action about something other than price. I don't think you can divide ASTRA just into price or something like that. But why not? Well, because this federal statute on which all of these considerations I'm mentioning come into play is not just about price. It's about price. It's about diversion to somebody other than a patient of the 340B price drug. What about maybe a slightly better version of that argument which says ASTRA is limited to those things that are expressed in the 340B program. So price, diversion, the things that are expressly included, ASTRA would prohibit. But you could bring a private right of action on anything else you wanted to. There are multiple things, including price and diversion. There's duplicate discounts. No, no, I'm asking a different question, right? Which is, could you bring a private right of action to enforce something, a state law where the 340B program was silent under ASTRA? You can't do something that interferes in the 340B program. But ASTRA was about, they were trying to sue as a third-party beneficiary to the contract. Right. And the Supreme Court said you can't do that. There's no private right of action. We can't have everybody claiming to be a third-party beneficiary. That's covered entities trying to be third-party beneficiaries. And the court said no. But the question that we're trying to get to now is, what if there's a state law that has nothing to do with being a third-party beneficiary? They're not trying to enforce the contract, the PPA, or anything. They're trying to enforce a different law. Why not? Why does ASTRA cover that? Let me just answer it two ways. First, if it's a state law of general applicability, the preemption principles would apply if there's either a conflict or ASTRA comes into play. The question I think that's being asked here is, what is the field? If this yields field preemption, if the ASTRA rationale, if it was a state law claim rather than a federal common law claim, it would have been decided probably based on field preemption. So what is the field here? I think that's the question you're asking. What is the scope of the field? Yeah, the analysis would be the same, whether it's a private right of action as an ASTRA or whether it's a state attorney general action in a preemption context. But the question, even though they are in slightly different contexts, one is a third party right of action. The other is whether a state AG can enforce. But those seem to be the flip sides of the same coin. So here's what the field is. It includes what can the federal government do in regulating what's an appropriate offer under A1. And that is a question of what conditions. I think Your Honor repeatedly asked this over the last hour or so. What exactly are the conditions that are appropriate and what are not? That is within that field. That controls the extent of your obligation. I'm sorry, say your field again. The field is what can the government, what can the federal government not require. It's tempting to say everything about 340B is within the field, but let me be much more precise because I'm not saying exactly that. So A1 is about what you're required to offer. And as you know, both Judge Katsas in Novartis and Judge Bibas in the Third Circuit case say, well, there are certain things that you can do in your offer and certain things that you perhaps don't need to do. But the question is the federal government, when it regulates that offer, that ought to be part of the field. What are you actually obligated to do? And I'm not obligated to ship to more than one contract pharmacy. We know that from Novartis. That's part of this field that the rationale in ASTRA ought to cover. Also diversion, also duplicate discounts, but it certainly is what am I obligated to provide the 340B price on. That is a pricing question, but it's also a delivery question. As we saw in the Novartis case, the court applied a very specific test. It's a bona fide offer, reasonable offer. If your offer under A1 is bona fide and reasonable, according to federal government, you can do that. The state says it's illegal. Very specific black and white problem. Irreconcilable conflict. I'd like to be a little more specific about the conflict between the types of enforcement provisions in the federal and the state statute, if I might. So this is Section D. It came in 2010 amendments Congress promulgated. These amendments are addressed in ASTRA. The federal contract has an informal dispute resolution process. There are pricing discrepancies addressed through corrective actions. All of this is an iterative framework meant to ensure compliance. That's the purpose of what Congress did. It was settling problems that existed at the time. It was creating tools for the agency to resolve these issues, including the unique administrative dispute resolution process. That is not what the state's enforcement provisions do. They have a $50,000 per drug package penalty. They are attempting to compel conduct that's not required by federal law. These things, as the Supreme Court has told us in Gould and Crosby, when you have competing enforcement mechanisms like this, conflict is imminent. These things cannot coexist. There has to be preemption. The district court also talked about... All right, I think we've got you. Thank you, counsel. Thank you. Ms. Ellsworth, I think you're now at our next seven minutes. Thank you, Your Honor. I want to start where West Virginia started, which was to invoke its historic police power as a reason to allow this statute to exist. There is no history of the state of West Virginia regulating historically 340B drug sales or offers. There's none. This is not an exercise of historic police power. This is not a law of general applicability, and that argument should be put to the side. Second, I heard West Virginia tell you... Certainly there is a history of West Virginia regulating pharmaceuticals, how they can be delivered, pharmacies, pharmacists, how drugs get to patients, all of that, right? There is no history, maybe, of West Virginia regulating the price of a particular federal program, and that's what makes it 340B. But it kind of glosses over a lot to say there's no history of it regulating 340B drugs. Sure they did. All the drugs that are covered by this program. You are far more precise than I was in making the point that I intended to make. That is exactly right. This statute gets at the price term for the 340B drugs that arrive at a contract pharmacy. There is no history of West Virginia regulating that price, and that's why, Your Honor's examples of other things West Virginia might do that are issues of general applicability to pharmaceuticals. You have to have a license. You have to have refrigerated trucks. You have to have certain security if it's opioids. Those are things that there is a long history of states and the federal government working together, sometimes separately, sometimes together, in those sorts of circumstances. And to make pharmaceuticals easy for patients to get who need them, right? There's a pharmacy in your neighborhood you can go to. That's right. And that's West Virginia's interest. West Virginia actually raises patient access, I think, seven times in its brief. I didn't hear them talk about it a lot today, but Your Honor's question touches on it. And so I do want to be very clear that nothing about this statute changes patient access in any way. These drugs, whether they are priced at a commercial price or they are priced at a 340B price, every Novartis product is available in every CVS, every Walgreens, every neighborhood pharmacy throughout the state of West Virginia. So any customer who walks in the door with a prescription can walk out the door with the drug in their hand. This statute has nothing to do with that patient access. What I heard West Virginia say is that the problem is that the covered entities otherwise would have to acquire all the drugs themselves and then distribute it out to the pharmacies, and that would result in delay. That is wrong. And I want to make very clear that that is wrong. That would be diversion. Under the federal 340B program, the only person to whom the covered entity can give the drug is a patient of the covered entity itself. That is exactly why, in 1996, HRSA came up with this one-contract pharmacy policy, because covered entities that did not have their own in-house pharmacy had no way to take advantage of the program, because they couldn't give them to a pharmacy down the street or across the street. So HRSA said you have to have one. Novartis recognizes that and says you can have one, but it is not the case that the delay is the reason for this statute. Does the statute require you to have one, or does the statute allow a manufacturer to say we won't deliver to anyone except the covered entity? So, Your Honor, I think there's a question about whether the statute would require one. The way HRSA has interpreted it is that in order for there to be a bonafide offer, there would have to be a way for the covered entity to accept it, and for the covered entity who doesn't have an in-house pharmacy to accept it, there would need to be a contract pharmacy, one, available to that covered entity to use. That's how the Novartis policy works as well. That's what the D.C. Circuit addressed in the Novartis decision there. Does that answer Your Honor's question? The next thing I wanted to mention is that, because I know this court takes the creation of a circuit split quite seriously, and there is an Eighth Circuit decision out there on preemption that goes the other way. I think that decision is wrong for four reasons, and I want to specify what they are. The first is where I started talking with you, Judge Rushing, is that McLean assumed that state regulation of the 340B program was a traditional area of state regulation, and I think that is plainly incorrect. There is no state anywhere in the country that has attempted to regulate 340B sales or delivery at any point until a couple of years ago. So that, I think, is incorrect. The second is that the Eighth Circuit, I think, got caught in a tangent about who maintains title to drugs in this replenishment model context, and it looked to a 1996 HRSA document that is from a different time period when I think the single contract pharmacy did actually maintain separate inventory of the commercially priced drug and the 340B priced drug. So there was a sense that the covered entity could retain title. The replenishment model makes crystal clear that there is no retention of title by the covered entity. The patient of the covered entity has already walked out the door long before this retroactive accounting mechanism is being used after a third-party administrator has come in. Isn't it an offer letter that we will not operate on a replenishment model? There seems to be a lot of, you guys are really concerned about the replenishment model, and maybe you should be, and all the algorithms and stuff. Could you contract around that? Federal law is silent. I don't know that anyone has tried to contract around that, but that is what the one contract pharmacy, the claims data requirements that we do use, are getting at the same concerns that the replenishment model raises. So whether there might be a different way to get at those concerns I think is a topic for another case and another situation. How do you get reasonable cause to audit when a covered entity only uses one pharmacy? What are some examples of how you've gotten reasonable cause to audit in that situation? I think this goes to something, and my time is up. Is it okay if I answer your question? This goes to, I think, Judge Richardson's comments in the earlier case, which is that determining whether there is potentially diversion or duplicate discounting or someone is not a patient of the covered entity who's getting the drug is much simpler as a process when there is only one pharmacy that you are looking at. Yeah, but how do you do it? I'm just curious because a big part of the argument here, the district court seems concerned that claims data is the way to figure out if you are entitled to an audit. And I wanted to know, when you're not dealing with this problem of lots of different pharmacies, say it's just an in-house pharmacy or just one, how do you get reasonable cause? I believe it is still the way because what claims data gives you as a manufacturer is it identifies the patient. How do you get that? How do you get it? From the pharmacy. Do you just ask? From the pharmacy or the covered entity, yes. And to be clear... Can you get it without claims data? Can you have reasonable cause to audit? Because your friend on the other side said claims data only comes in an audit. So that is actually, I think, incorrect. But claims data is something that pharmacies regularly share with not just manufacturers, but anytime you're exercising insurance. Insurance companies get claims data as well. It's a mechanism of just making sure that the person is actually... Who the person is, who the physician was who provided it. The D.C. Circuit gives an example of you could have a physician who has a private practice and also works at a hospital or has admitting privileges at a hospital. So you might want to know, for example, was the prescription that was written for an encounter that occurred in the private practice or was it related to an encounter in the hospital? That might factor into whether the person was a patient of the covered entity for purposes of the 340B program. This claims data is very basic data that pharmacies and covered entities regularly provide. They provide it to CMS for Medicare and Medicaid for the same sorts of reasons. And they provide it because there's a requirement in the offer letter requiring them to turn it over? So it is part of the Novartis... For a different reason. You mentioned insurance. So I think they turn it over in general because it's part of a payment system for insurers for the federal health care programs. Manufacturers, including Novartis, use it as part of their 340B program. It is one of the terms of the offer that Novartis makes to covered entities. Is there a way to get it without having this contractual requirement? It sounds like there's... There is not, Your Honor. It can be turned over to insurance, you mentioned. There is not a way for a manufacturer to get it other than asking the covered entity or the pharmacy to turn it over. Question regarding the reasonable cost. Because he says it's pretty simple. And I'm not sure if you're agreeing with that or not. But he says that you can basically say that there's a difference in the quantity of drugs or it could be something as simple as someone making a complaint. And that is reasonable cost for the audit and that you don't need the claims data. So, Your Honor, I disagree that you don't need the claims data. And I think the D.C. Circuit talks about the importance of claims data in its decision. And when it said that a claims data policy was okay. As I understand West Virginia's argument, it's that a manufacturer might somehow stumble across another indicator of a need for an audit. But because there's suddenly a huge increase, for example, in the number of drugs sold. But that is not the only purpose that claims data serves. So, just let me try and again make this very practical. Imagine that I got seen by a hospital in West Virginia when I was on vacation. It was a 340B hospital. I'm now home in Virginia. I go to my primary care doctor. I get a prescription for antibiotics. I fill it at the CVS at my home in Virginia. Does the 340B entity in West Virginia get to claim me as a patient because I once filled a prescription there? These are the sorts of questions that claims data help manufacturers determine. Or was I doing something at the CVS down the street from me that was actually connected to my past hospital visit in West Virginia? Only claims data makes that kind of granular information available, which is what a manufacturer needs to have the required documentation to even conduct an audit. You don't get to just do an audit because you want to do an audit. You are required to have documentation of a reasonable cause to do so. And claims data is how manufacturers get that. Thank you very much, Your Honors. Happy to hear from you. May it please the Court. Matthew Owen again for AbbVie. I'd like to take through a couple of points, the theme of which would be that we should focus on the text. So starting with ASTRA, there's been some discussion about what ASTRA covers, what the ADR process covers, and whether it involves just pricing or other kinds of disputes. I think this is the type of issue where the text of the Supreme Court's opinion, the regulation, and the relevant statute resolve this. So what ASTRA says at page 122 of the Supreme Court's opinion is that Congress created the ADR process as the proper remedy for, quote, overcharges. And it cited a provision of the 340B statute, which is 42 U.S.C. 256B. That's the statute. And then subsection D starts to talk about, quote, overcharges and then the remedies for them. Section D3 is the part of the statute that says the Secretary shall promulgate regulations to establish an administrative process for the resolution of claims by covered entities that they have been overcharged. That's the same word. And then the statute, the regulatory provision that we discussed earlier, 42 CFR 10.21A1, when it says that the kinds of claims the ADR tribunal is supposed to hear includes any claim that a manufacturer has limited 340B pricing. Well, what I didn't say earlier is that it does so by defining an overcharge claim to include that type of claim. So it is extremely clear from ASTRA itself that what the Supreme Court is saying is this isn't some implied preemption issue or a generalized inquiry into a field. There is a specific federal law, 42 U.S.C. 256B subsection D, and that statute confers jurisdiction on the ADR tribunal to hear certain kinds of claims and to promulgate regulations to establish those claims. The agency has now done that. That regulation postdates Novartis, Sanofi, McLean, all those decisions. But the regulation itself on its terms says that an overcharge claim covers any claim that a manufacturer has limited an ability to access 340B pricing, which is the only thing that West Virginia law really does because, as I explained earlier, all of these restrictions live at the offer level. You can find... So the regulation is doing the preempting? The regulation is a force. Well, it's not just the regulation. It's the statute that does. Regulations can have preemptive effect if they're authorized and have the force of law, of course. But my point is that what the regulation covers, and it does have preemptive effect while extant, is defined by statute. And when ASTRA said the ADR process covers pricing, which is what the previous discussion, what it really said is that it covers claims for overcharges. Those have been defined in the regulation to include claims of exactly the kind that West Virginia is trying to set up a system of adjudication in state court to work out. By way of example, I think Your Honor asked earlier, what if a manufacturer said we'll sell you the 340B drugs if you agree to the no replenishment model? Well, that would be a limitation on 340B adjudication, or 340B pricing access. I'm not aware of anybody trying it. But if they did, the only way to adjudicate whether that was legal would be to go to the ADR tribunal and say this is a, quote, limitation on our ability to get 340B drugs because we can't get the sale at all if we don't agree to this no replenishment example. And the Supreme Court says the ADR tribunal's jurisdiction is exclusive. You cannot have lawsuits in court that might interfere with the agency's ability to administer the program on a uniform basis. That is an example of a kind of claim that I assume would violate the West Virginia statute because it would be a refusal to sell or a denial of the acquisition of our drug on some condition that West Virginia says is unlawful. And that seems to be the same thing. I did want to refer the court. There are a number of examples of our policies in the record, but one that's very clear is JA-277. And just so that it's really clear that these restrictions live at the offer level, it says covered entities, you know, will be offered and may purchase AbbVie medicine at the 340B price provided it is shipped to the covered entity location. A proviso clause in a contractual offer means we will offer you, you will be offered this drug at this price in unlimited quantities provided that it will be delivered at one pharmacy. That means if they don't agree to that, there's no sale at the 340B price. Could they limit it to only shipping to the covered entity itself? I agree with my friend on the other side. The question, it's not an issue here, but it would be a really serious question whether you could do that because as Section 4 of the Novartis opinion kind of has a good phrase for this, which is, is it a bona fide offer? And if the covered entity couldn't accept it, I suspect the ADR Tribunal might say, well, that's not a real offer because there was no way for that entity to accept it, which is more or less what the agency said in 1996, which is where all this comes from. In other words, the manufacturer policies that we're talking about here basically reflect the way this program worked for most of its life because in 1996, the agency said this is how it's got to be throughout the program. The only other thing I wanted to make sure I said is the patient access point is completely clear in the record as well. That is, if you were to look at Joint Appendix 486, you would see a GAO report making clear that 340B pricing limitations don't affect access to patients. And at page 438 to 439, you'd see that about 1.4 percent of the time do patients participate in any way in the savings. And from our perspective, that relates to a lot of things, but one of them is our takings claim because we're talking about the transfer of our property to someone else so they can profit from it instead of us. And to the extent that anybody here on the other side thinks that that's a taking for public use within the meaning of KELO, all I would say is the record's pretty clear that money doesn't go to the public and it doesn't go to any integrated economic development plan that the court, even in the high watermark of KELO, said would still be a necessary requirement. Thank you, Your Honor. Mr. David, happy to hear from you. Thank you, Your Honor. And I want to start back at the field. This is a field that is traditionally regulated by the states, and this court in the Just Puppies versus Brown case specifically talked about when Congress intrudes into a state-regulated field and they don't occupy the entire field. This is just like a level of generality problem. You want to say, oh, no, no, no, let's just pop it up two levels of generality, and this is about health and safety. And they're saying, no, the field is defined by what you've tried to attack. And so if you had a general law, maybe that's the right field to think about, but you have a law that's focused just on 340B offers. And so the question is, does the state typically involve itself in those types of questions? And the answer doesn't seem like there's a traditional historical basis, given that the right level of generality is the sort of 340B offers. Regardless of the level of generality, this is still a state-regulated field, whether it's health and safety, whether it's pharmacy, whether it's just drugs, whether it's delivery of drugs. Okay, so what you've just done is said, at a high enough level of generality, I can pick different words, but all of those are way up here in a level of generality. None of those are in the field that we're really talking about. Nobody is arguing that the 340B program preempts the field of drugs. That's a crazy argument. Nobody thinks the field that it preempts is all of pharmacy, such that the state of West Virginia cannot license a pharmacist. That's a laughable answer. The question is, does it preempt the field of 340B offers? And once you appropriately define the level of generality, this history doesn't seem to get you very far. Again, that's the position that lost in both Sanofi and Novartis. Okay, I'm bound by neither of them, right? All I'm going to do is figure out what the right answer is. And what I'm saying is that the manufacturers were correct in that, that the offer and delivery are separate concepts, and that Sanofi and Novartis are both correct on that point. And the 340B only regulates pricing, and it doesn't touch delivery, and that leaves that open for the states to regulate. And I want to get through a couple of other points. Another way to look at this is actually to look at the pharmaceutical pricing agreement. It's at JA272, and it says, disputes arising under a contract between a manufacturer and a covered entity should be resolved according to the terms of that contract. Actions taken by the parties in such disputes are not grounds for termination of the agreement with the secretary. Can you give me any examples after ASTRA where there was a state law contract claim between a covered entity and a manufacturer? Like, are there any such state law actions? Well, there are... I mean, just do you know of any example? Because I would think ASTRA sort of closes the door to that. And so what I'm curious is, are there examples of that, that like they showed up and they brought state law claims, like private rights of action, about, you know, the delivery or offer or contract between the manufacturer and the covered entity? I'm not aware of any between a covered entity and a manufacturer where the covered entity has specifically brought something that's related to delivery outside of complaints that have happened in states that have passed these particular laws. Right, and what I'm talking about is in the context, I mean, what you just said is like, oh, no, no, just let them go bring their private right of action. But ASTRA seems to tell us, like, that doesn't exist. And the fact that nobody's bringing these state law contract claims suggests that other people understand ASTRA that way too. I don't think that that's the way that we are to understand ASTRA. So first, ASTRA wasn't a preemption case. It had nothing to do with preemption. It didn't involve a state, it didn't involve a state statute, and it also didn't involve delivery. It was about whether they were being charged more than the price that they were obligated to sell the drug at. That's clearly something that's covered by 340B. That's clearly something for the ADR process. There's no dispute on that. And so they weren't able to bring an action outside of what 340B says you are allowed to do for pricing. And so this is a completely different issue. And now that these states have passed these laws about delivery, they've been upheld by every court outside of West Virginia, those claims are being brought. They are being brought through the state's enforcement actions. But not private rights of action, right? Those are state AG actions, right? I don't know how every single one of those cases work, but I do think that some of them do permit private rights of action. Thank you very much, Mr. David. We'll come down and greet counsel, and we'll take a brief recess before we go to our final case. This honorable court will take a brief recess.
judges: Julius N. Richardson, Allison J. Rushing, DeAndrea Gist Benjamin